```
              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
                       AT CHARLESTON
```

**DREAMA GOUGE, dba**
**LIFESTYLE FURNITURE, INC.**

      Plaintiff

v.                                   Civil Action No.: 2:04-1083

**PENN AMERICA INSURANCE**
**COMPANY,**

      Defendant


<u>**MEMORANDUM OPINION AND ORDER**</u>

Pending is defendant's motion for summary judgment filed April 22, 2005.

I.

Since 1990 or 1991, plaintiff has operated Lifestyle Furniture Inc., a home furnishings warehouse, in a building formerly occupied by the Marmet Junior High School. (Pl.'s Resp. at 1; dep. of Dreama Gouge at 10-11.) Until 1999 the store employed as many as fifteen people. (Gouge dep. at 27.) Since that time, only plaintiff, her mother, and four other people have worked at the location. (<u>Id.</u> at 29-30.) Customers have been seen

by appointment only.  (Id.)  The business' decline commenced with plaintiff's diagnosis of lupus and injuries she sustained in an automobile accident.  (Id. at 31.)

In 2001, a pattern of vandalism and burglaries commenced at the location.  In August 2001, a burglary resulted in the loss and damage of certain merchandise, along with the theft of, inter alia, cash, tools, a television, and a lawnmower.  (Id. at 38.)  Both law enforcement and plaintiff's insurer, Nationwide Insurance, were notified.  (Id.)  Plaintiff testified that the perpetrators returned on at least two occasions that year.  (Id. at 40-41 ("They had a party there.  It was a place to get away from home basically.").)  The losses resulting from the 2001 damages ultimately became the subject of litigation between plaintiff and Nationwide.  (Id. at 43.)

In December 2001, plaintiff was sent a letter from Nationwide addressed to "LIFESTYLE FURNITURE & DESIGN" stating pertinently as follows:

> While we appreciate the opportunity to provide your insurance protection, we are at this time, unable to continue your BUSINESSOWNERS.  Therefore, cancellation is effective at 12:01 a.m. on FEBRUARY 27, 2002.
>
> This action is due to relevant loss information.
>
> This advance notice should provide sufficient time for you to arrange for other protection.  Because of the

>    importance of this coverage, we urge you to act
>    promptly.

(Def.'s Reply on Summ. J., ex. H.)[1]

In February 2002, the property was vandalized for a fourth time. (Id. at 43.) This resulted in a host of damaged property, ranging from equipment to merchandise. (Id. at 44.) A leather sofa, a chair, and a television were also stolen. (Id.) Pursuant to the December 2001 cancellation notice, plaintiff's coverage with Nationwide would have lapsed near the end of that same month, on February 27, 2002.

Although the cancellation notice was sent in December 2001, plaintiff asserted she had the following conversation with her Nationwide insurance agent, Kim Bell, later in what must have been the year 2002[2]:

---

[1]This cancellation notice was attached to the reply brief. Plaintiff's response does not discuss the document, and she did not move to file a surreply to explain it. At the pretrial conference, the court inquired about the notice. Plaintiff's counsel maintained his client told him she had not received it. He conceded the notice was properly addressed and that she was not confronted about the document during her deposition.

[2]In her deposition, plaintiff said this conversation occurred in 2003. Instead, it appears the exchange occurred in 2002. Plaintiff asserted the conversation reproduced below with Ms. Bell was the catalyst for her insurance application with defendant. Plaintiff applied with defendant in June 2002. (Def.'s Mot. Summ. J., ex. C.) It thus appears plaintiff erred
(continued...)

>       Because with Nationwide I had had a claim pending, which had never been paid, but I had made a claim for burglary and theft and damage.  And the – rep was Kim Bell and she called me and we had had insurance for both stores with Nationwide for many years.
>
>  . . . .
>
>       And she was sorry that <u>she felt like they would – would cancel me because we had had a claim pending</u>.
>
>  . . . .
>
>       And she told me that I should go ahead and apply for other insurances.
>
>       Q.    And you took that to mean I'm not getting my insurance renewed?
>
>       A.    Right.  So she give me the opportunity because through the years she had been my insurance person, that she took it upon herself to tell me to go ahead before they cancelled me to go ahead and get other insurances.

(<u>Id.</u> at 49.)

As a result of her conversation with Ms. Bell, plaintiff explained in detail her search for replacement coverage, which apparently took place in the summer of 2002:

>   Q.   Okay.  Who did you contact regarding obtaining insurance for the property?
>
>   A.   In total?
>
>   Q.   Uh-huh.

---

[2](...continued)
in using a 2003 time frame.

> A. The one that I talked to? I talked to three insurance companies. And told them my needs.
>
> Q. Who were the three insurance companies?
>
> A. Allstate, Cathy Huffman, Austin Insurance.
>
> Q. Okay. Why did you contact three?
>
> A. Because I had had breaking and entering and stealing and I was going to be changing insurance companies and so I called the – I got in the phonebook and called several and told them the situation, <u>to see if they would cover me</u>.
>
> Q. <u>Okay. And what did they tell you in order of what you just named</u>?
>
> A. <u>No, no</u> and maybe.
>
> Q. Who was the maybe?
>
> A. Austin.
>
>    . . . .
>
> Q. All right. Well, go ahead and tell me about – about the maybe.
>
> A. I talked to Austin, Mr. Jim Fisher.

(<u>Id.</u> at 48-49.) After speaking with Mr. Fisher further over the phone, he assisted her in applying with the defendant on June 19, 2002. (<u>Id.</u> at 47, 49.)

At her deposition, plaintiff was questioned at length about her disclosures to Mr. Fisher during the application process. Following her rather specific disclosures earlier in

5

her deposition, as quoted above, concerning Allstate's and Huffman's refusal to "cover" her because of her claims history, plaintiff testified as follows later in her deposition when questioned by her own lawyer:

> Q. I'm going to try to be quick and go back. Dreama, with regard to Exhibit B, that is the application that Mr. Lindberg questioned you about. He questioned you in detail about question six on the first page, which reads, "Any policy or <u>coverage declined</u>, cancelled, or nonrenewed during the prior three years." This is dated June 19, '02. Here are my questions. As of June 19, '02, had you had a <u>policy</u> declined on that date?
>
> A. No.
>
> Q. As of June 19, '02, had you had a <u>policy</u> cancelled in the past tense on that date?
>
> A. No.
>
> Q. Had you had a <u>policy</u> as of June 19, '02 that had not been renewed by that date?
>
> A. No.
>
> . . . .
>
> Q. Did [Nationwide] send you a notice of nonrenewal on or about June 19, '02?
>
> A. No.

(<u>Id.</u> at 243-46 (emphasis added).) As noted, plaintiff did not mention the December 2001 Nationwide cancellation notice that her lawyer now asserts she did not receive. She was not confronted with the document at her deposition.

During the application process, it is undisputed that Mr. Fisher asked plaintiff the questions listed on the policy and plaintiff responded to them. (Id. at 54 ("He asked me questions. I answered them.").)  As alluded to in the foregoing deposition testimony, on the first page of the application, just above plaintiff's signature, appears the following question and response:

| EXPLAIN ALL "YES" RESPONSES | YES | NO |
|---|---|---|
| . . . . | . . . . | .. . . |
| 6.  ANY POLICY OR COVERAGE DECLINED CANCELLED OR NON RENEWED DURING THE PRIOR 3 YEARS? NOT APPLICABLE IN MO | | X |

(Ex. C, Def.'s Mot. Summ. J.)  On the subject of cancellation, plaintiff told Mr. Fisher only that she "was told by [her] insurance agent that to look for other insurance that I could possibly be cancelled."  (Id. at 52 (emphasis added); see also id. at 53 (recounting her notice to Mr. Fisher that Ms. Bell told her "that I possibly would be cancelled." (emphasis added).)  There is no indication plaintiff disclosed to Mr. Fisher that she was refused coverage when she inquired of Allstate and Huffman.

Plaintiff asserts she was shown only the first page of the application, which she signed.  (Id. at 53.)  At first, plaintiff conceded that she read, at a minimum, the first page where both her signature and the foregoing written response appear. (See Gouge dep. at 55 ("Q. And did you read it before you signed

7

it? Do you recall reading it before you signed it? A. Yes".) Just moments later during the deposition, however, the following exchange occurred:

> Q. What is number 6?
>
> A. "Any policy or coverage declined, cancelled or nonrenewed during the prior three years?"
>
> Q. And how did you respond to that?
>
> A. Then it says not applicable.
>
> Q. I think it says no. That is the box that is checked; is that right?
>
> A. But it says not applicable.
>
> Q. It says not applicable in Montana.
>
> A. He's checked no.
>
> Q. Okay. Now, you said a minute ago that you read that application. Is that response truthful?
>
> A. No. I told him that I was going to be cancelled, possibility.
>
> Q. That wasn't – that wasn't my question. My question was is that answer truthful?
>
> A. I don't think it is, but he put it down.
>
> Q. And you read it and you signed it correct?
>
> A. I signed it.
>
> Q. And you said earlier that you read it; isn't that not correct?
>
> A. I skimmed over it, yes.

(Id. at 56-57.)

Based upon the application, defendant provided plaintiff the coverage she requested.  On November 17, 2003, following subsequent losses at the insured property, defendant sent plaintiff a rescission notice, the relevant portion of which is quoted below:

> Penn-America Insurance Company hereby notifies you that the above captioned policy is being rescinded due to misrepresentations, concealment of facts, and/or incorrect statements that were material to the subject matter of the policy insurance and that substantially increased to [sic] risk or hazard assumed by Penn-American Insurance Company.  More specifically, the signed Acord Commercial Insurance Application Form 125 stated no losses.  However, our claim investigation discovered prior vandalism losses.  Penn-American contends that if, [sic] these losses had been disclosed on the application of insurance, Penn-America would not have issued the policy nor insured the risk.

(Ex. G, Def.'s Mot. Summ. J.)[3]

On September 1, 2004, plaintiff instituted this action in the Circuit Court of Kanawha County.  On October 6, 2004, defendant removed.

---

[3]Plaintiff makes much of the fact the rescission notice does not mention the omissions concerning prior cancellations and denials of coverage.  That consideration is of little moment.  Plaintiff cites no legal basis for preventing an insurer in this setting from relying upon still other evidence of material misrepresentations acquired after an insurer's more thorough investigation of the facts once a policyholder has commenced litigation.

II.

A. The Governing Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. <u>Id.</u> The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact

for trial.  Fed. R. Civ. P. 56(c); <u>Id.</u> at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-moving party.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is not appropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  <u>Overstreet v. Kentucky Cent. Life Ins. Co.</u>, 950 F.2d 931, 937 (4th Cir. 1991).

In reviewing the evidence, a court must neither resolve disputed facts or weigh the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

**B.    The Merits**

West Virginia Code section 33-6-7 governs misrepresentations in insurance applications. The statute provides pertinently as follows:

> Misrepresentations, omissions, concealments of facts, and incorrect statements shall not prevent a recovery under the policy unless:
>
>> (a) Fraudulent; or
>>
>> (b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or
>>
>> (c) The insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise.

W. Va. Code § 33-6-7.  The West Virginia Supreme Court of Appeals has held:

> "Where an insurer seeks to avoid a policy based on a material misrepresentation, this assertion is in the nature of an affirmative defense which the insurer must prove by a preponderance of the evidence." Syl. Pt. 7, <u>Powell v. Time Ins. Co.</u>, 181 W. Va. 289, 382 S.E.2d 342 (1989).

<u>Massachusetts Mut. Life Ins. Co. v. Thompson</u>, 194 W. Va. 473, 474, 460 S.E.2d 719, 720 (1995).  In syllabus points 3 and 4 of <u>Thompson</u>, the West Virginia court discussed the showing necessary

for an insurer seeking absolution of its coverage obligation under the statute:

> 3. "Under W. Va. Code, 33-6-7(b) and (c) (1957), in order for a misrepresentation in an insurance application to be material, it must relate to either the acceptance of the risk insured or to the hazard assumed by the insurer. Materiality is determined by whether the insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise." Syl. Pt. 5, Powell v. Time Ins. Co., 181 W. Va. 289, 382 S.E.2d 342 (1989).
>
> 4. "W. Va. Code, 33-6-7 (1957), adopts the test of whether a reasonably prudent insurer would consider a misrepresentation material to the contract." Syl. Pt. 6, Powell v. Time Ins. Co., 181 W. Va. 289, 382 S.E.2d 342 (1989).

Id.[4]

---

[4] Precedent construing section 33-6-7 initially spawned some confusion as to whether it was incumbent upon the insurer to prove a state-of-mind element in these types of cases. See syl. pt. 4, Powell v. Time Ins. Co., 181 W. Va. 289, 289, 382 S.E.2d 342, 342 (1989) ("In order to be fraudulent under W. Va. Code, 33-6-7(a) (1957), misrepresentations, omissions, concealments of facts, and incorrect statements on an application for insurance by an insured must be knowingly made with an intent to deceive the insurer and relate to material facts affecting the policy.") The issue was resolved in Thompson via a certified question from this district. The supreme court of appeals held:

> Under a disability insurance policy, neither West Virginia Code § 33-6- 7(b) nor (c) (1992) requires that an insurer prove the subjective element that an insured specifically intended to place misrepresentations,

(continued...)

The court is further aware of the caveat to the general rule, re-stated by the supreme court of appeals in <u>Jarvis v. Modern Woodmen of America</u>, 185 W. Va. 305, 309, 406 S.E.2d 736, 740 (1991):

> "If the facts regarding the risk are correctly stated to the agent of an insurance company, but erroneously inserted by him in the application, the company is chargeable with his error or mistake . . . . "

<u>Id.</u> at 309, 406 S.E.2d at 740 (quoting syllabus <u>Bays v. Farmers' Mutual Fire Ass'n of West Virginia</u>, 114 W. Va. 164, 171 S.E. 253 (1933)).

In resolving this case, one need look no further than plaintiff's deposition testimony and the documents she concedes she read. First, plaintiff acknowledges Mr. Fisher asked her the questions appearing on the application. (Gouge dep. at 54 ("He asked me questions. I answered them.").) One such question was whether plaintiff had "any . . . <u>coverage declined</u> . . . during the prior 3 years[.]" (Def.'s Mot. Summ. J., ex. C (emphasis added).) This question appears on the first page of the application, a page

---

⁴(...continued)
omissions, concealments of fact, or incorrect statements on an application in order for the insurer to avoid the policy.

<u>Thompson</u>, 194 W. Va. at 474, 460 S.E.2d at 720.

plaintiff concedes she read before signing.  (See id. at 55 ("Q. And did you read it before you signed it?  Do you recall reading it before you signed it?  A. Yes").)  Prior to meeting with Mr. Fisher, plaintiff testified about contacting both Allstate and Huffman "to see if they would cover" her.[5]  (Id. at 48.)  One is struck by plaintiff's use of the word "cover[,]" a close variant of the same term used in the application.  According to plaintiff, those two providers responded "no[,]" to her coverage request based upon her claims history.[6]  (Id.)  Hence, plaintiff concedes an understanding,

---

[5]As noted, plaintiff told the two providers about some of the claims history at the property.  Despite the troubling track record at the insured location, plaintiff was determined to find coverage.  When asked whether she told Mr. Fisher the claims history, she stated:

> I told him on the phone because I knew that would be an issue and I knew that, you know, I was going down the list until someone would – would sell me the insurance.

(Gouge dep. at 51 (emphasis added).)

[6]Plaintiff's lawyer appears to contend that because she had never been "formal[ly]" declined coverage by other insurers following a written application for insurance, the "coverage declined" inquiry by Mr. Fisher during the interview did not require an affirmative response.  Plaintiff's testimony, however, demonstrates she deemed both Allstate and Huffman to have declined to "cover" her based upon her past claims history.  Further, the assertion is a bit counterintuitive for another reason.  It is powerful evidence in a risk-assessment setting if an agent deems the likelihood of a policy being issued so negligible that he turns away the potential insured, and the corresponding commission, without allowing her the opportunity to so much as execute an application.

prior to meeting with Mr. Fisher, that she had "coverage declined . . . during the prior 3 years" preceding the application.  It appears undisputed, however, that she did not so inform Mr. Fisher.

It is difficult for one to imagine a fact more "[m]aterial either to the acceptance of the risk, or to the hazard assumed by the insurer" than that other potential providers had previously declined coverage, turning an interested customer away without even allowing her to execute an application.  W. Va. Code § 33-6-7(b).  Further, as noted by Joe Mossbrook, an underwriter employed by defendants, defendant would not have issued the policy had it known the facts:

> Had the . . . [plaintiff] answered the question as to whether the Applicant had "any policy or coverage declined . . . during the prior 3 years?," truthfully with information regarding declination of coverage within the prior three years, the . . . [defendant] would not have issued the policy which is the subject of this action.

(Def.'s Mot. Summ. J., ex. F); see W. Va. Code § 33-6-7(c).  As a matter of law, a reasonably prudent insurer would consider plaintiff's undisputed omission on this point to be material to the contract and would not have issued the policy if it was aware of the omitted facts.[7]

---

[7]Moreover, the court notes the lopsided nature of the evidentiary record concerning the Nationwide cancellation.  When
(continued...)

16

Based upon the foregoing, defendant is entitled to judgment as a matter of law on plaintiff's claims. The court ORDERS that defendant's motion for summary judgment be, and it hereby is, granted. It is further ORDERED that this action be, and it hereby is, dismissed and stricken from the docket.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: July 12, 2005

_____
John T. Copenhaver, Jr.
United States District Judge

---

[7](...continued)
asked by Fisher about prior cancellations, plaintiff responded only that her existing coverage could "possibly" be cancelled at some future time. Later in her deposition she stated that, as of the time of the interview with Fisher on June 19, 2002, she had not had a policy cancelled and had not had a policy that was not renewed. This account stands in stark contrast to the December 2001 cancellation notice from Nationwide, which counsel concedes was properly addressed, coupled with the expiration of the annual coverage of the Nationwide policy on February 27, 2002, and the absence of a showing of payment of a premium to Nationwide for the year to follow. Failure to disclose a prior cancellation, like a prior declination of coverage, is, as a matter of law "[m]aterial either to the acceptance of the risk, or to the hazard assumed by the insurer[.]" W. Va. Code § 33-6-7(b).